1  Patrick C. Cooper (SBN 142349)               Michael F. Ghozland. (SBN 223032)
   James S. Ward (*Pro hac vice*)               Ghozland Law Firm, P.C.
2  Ward & Wilson, LLC                           555 West Fifth Street, Suite 3100
   2100 Southbridge Parkway, Suite 580          Los Angeles, California 90013
3  Birmingham, AL  35209                        Phone:  (213) 996-8327
   Tel:  205-871-5404                           Fax:  (213) 402-5147
4

5  Peter Burke (*Pro hac vice*)
   Burke Harvey, LLC
6  One Highland Place
   2151 Highland Avenue, Suite 120
7  Birmingham, AL  35205-4008
   Tel:  205-588-8671
8

9  Attorneys for Plaintiff
10 JAVID SIMINOU

11                 UNITED STATES DISTRICT COURT
12                 CENTRAL DISTRICT OF CALIFORNIA
13                                                  EDCV14-594- RGK  AJWx

14 JAVID SIMINOU,                          )  Case No.
   Individually and on Behalf of All Others )
15 Similarly Situated,                     )
                                           )
16          Plaintiff,                     )  **CLASS ACTION COMPLAINT**
                                           )
17 vs.                                     )
                                           )
18                                         )
   TEVA PHARMACEUTICALS USA, INC.;         )
19 TEVA PHARMACEUTICAL INDUSTRIES          )
   LIMITED; BARR PHARMACEUTICALS           )
20 INC.; BARR LABORATORIES INC.;           )  **JURTY TRIAL DEMANDED**
   DURAMED PHARMACEUTICALS INC.;           )
21 DURAMED PHARMACEUTICALS SALES           )
   CORP.; BOEHRINGER                       )
22 INGELHEIMPHARMA GMBH & CO. KG.;         )
   BOEHRINGER INGELHEIM                    )              BY FAX
23 INTERNATIONAL GMBH; and                 )
   BOEHRINGER INGELHEIM                    )
24 PHARMACEUTICALS, INC.                   )
                                           )
25                                         )
                                           )
26          Defendants.                    )
                                           )
27

   Plaintiff Javid Siminou ("Plaintiff"), individually and on behalf of a Class of all others
28

                        **CLASS ACTION COMPLAINT**

similarly situated (as defined herein), brings this action for damages and relief against defendants Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries Limited (collectively "Teva"), Barr Pharmaceuticals Inc. and Barr Laboratories, Inc. (collectively "Barr"), Duramed Pharmaceuticals Inc. and Duramed Pharmaceuticals Sales Corp. (collectively "Duramed"), and Boehringer Ingelheim Pharma GmbH & Co. KG, Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc. (collectively "Boehringer," and together with Teva, Barr and Duramed, "Defendants"), for violations of the federal antitrust laws, the Sherman Antitrust Act ("Sherman Act") and the Clayton Antitrust Act ("Clayton Act"), for violations of state antitrust and/or unfair and deceptive trade practices acts, and for unjust enrichment. Based on counsel's investigation, research and review of publicly available documents, on Plaintiff's personal knowledge, and upon information and belief, Plaintiff alleges as follows:

**INTRODUCTION**

1.      Defendants have conspired to prevent a less expensive generic equivalent of the drug Aggrenox – a drug containing aspirin and slow-release dipyridamole used to reduce the risk of stroke in people who have had a transient ischemic attack (or "mini-stroke") or stroke due to a blood clot and are at high risk of having another stroke – from entering the market. Plaintiff brings this action on behalf of a proposed Class of consumers who indirectly purchased or otherwise paid for Aggrenox, other than for resale.

2.      Boehringer received approval for Aggrenox from the U.S. Food and Drug Administration (the "FDA") in November 1999 and started selling the drug the following month. The launch of Aggrenox was a success, and Boehringer's U.S. sales for the drug grew to over $336 million in 2008. Barr manufactures generic pharmaceutical drugs, which on average retail for 75 percent – 80 percent less than equivalent brand named drugs. Barr sought regulatory approval to market a generic version of Aggrenox on January 31, 2007.  In response, Boehringer filed a patent infringement lawsuit against Barr.

3.      To dispose of the patent litigation with Barr, fend off the looming generic competition for Aggrenox and delay the resultant substantial lost profits, in August 2008 Boehringer entered into a series of settlement and related agreements with Barr under which the

**CLASS ACTION COMPLAINT**

1    companies agreed not to compete for Aggrenox. Specifically, under these "pay-for-delay" or

2    "reverse payment"1 agreements, Boehringer granted a license to Barr to sell an "authorized

3    generic" version of Aggrenox and agreed not to compete with Barr with Boehringer's own

4    "authorized generic," an arrangement that effectively split Boehringer's monopoly profits for

5    Aggrenox with Barr and allowed Barr to charge supracompetitive prices for Aggrenox.

6    Additionally, Boehringer and Barr entered into a purported "co-promotion" agreement that would

7    yield Barr, through its subsidiary Duramed, a one-time fee plus annual royalties based on net sales

8    of Aggrenox worth an estimated $120 million.

9            4.      The result of Defendants' unlawful agreement is that Plaintiff and the Class have

10   paid more for Aggrenox than they would have absent Defendants' anti-competitive conduct. But

11   for Defendants' pay-for-delay arrangement and agreement not to compete, less expensive generic

12   equivalents of Aggrenox would have become available to consumers sooner, and Defendants

13   would not have shared in the ill-gotten profits generated from the artificially inflated prices

14   Plaintiff and the Class paid for Aggrenox.

15           5.      Plaintiff seeks a judgment declaring that the reverse payment agreement and

16   Defendants' other unlawful conduct are unlawful under §1 of the Sherman Act, 15 U.S.C. §1.

17           6.      The situation is termed "reverse" because the payment moves in the opposition

18   direction as compared to typical patent litigation where a potential infringer pays the patent holder

19   to resolve the litigation. The U.S. Supreme Court has found that these types of settlements "tend to

20   have significant adverse effects on competition" because they can amount to sharing of monopoly

21   profits in order to prevent the risk of competition. See FTC v. Actavis, Inc., _ U.S. _, 133 S. Ct.

22   2223, 2231, 2234, 2236 (2013).

23           7.      Plaintiff also seeks an injunction pursuant to §16 of the Clayton Act, 15 U.S.C.

24   §26, to prevent Defendants' unlawful conduct from continuing unchecked and Plaintiff from

25   suffering further financial harm as a result of Defendants' antitrust violations. Plaintiff also asserts

26   claims for compensatory and treble damages and equitable relief for continuing violations of state

27   antitrust, unfair and deceptive trade practices acts and unjust enrichment laws.

28   //

**JURISDICTION AND VENUE**

8.     This Court has jurisdiction over this matter pursuant to 15 U.S.C. §26 and 28 U.S.C. §§1331 and 1337, in that the Plaintiff brings claims under §16 of the Clayton Act, 15 U.S.C. §26, for injunctive and equitable relief to remedy Defendants' violations of §§1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2. The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. §1367.

9.     Alternatively, this Court has jurisdiction pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1711, et seq., which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds five million dollars and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. The five million dollar amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

10.     Venue is proper in this Court under §12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391, because Defendants transact business in this District, a substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried on in part within this District, and the acts complained of have and will continue to have substantial effects in this District.

**PARTIES**

11.     Plaintiff Javid Siminou is an individual consumer who has purchased Aggrenox for his own personal use, and not for resale, at supracomptetive prices during the Class Period. Plaintiff is a citizen of the State of California who resides in San Bernadino County.

12.     Defendant Teva Pharmaceuticals USA, Inc., a wholly-owned subsidiary of defendant Teva Pharmaceuticals Industries Limited, is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania. It manufactures and distributes generic drugs for sale throughout the United States at the direction, under the control, and for the direct benefit of its parent company.

13.     Defendant Teva Pharmaceuticals Industries Limited is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, P.O. Box

**CLASS ACTION COMPLAINT**

1   3190, Petach Tikva, Israel. It is a global manufacturer of generic drugs, and is one of the largest
2   sellers of generic drugs in the United States. Teva purchased Barr on December 23, 2008.

3         14.     Defendant Barr Pharmaceuticals Inc. is a corporation organized under the laws of
4   the State of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff
5   Lake, New Jersey.

6         15.     Defendant Barr Laboratories, Inc. is a corporation organized under the laws of
7   State of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff
8   Lake, New Jersey. On December 23, 2008, Barr became a wholly-owned subsidiary of Teva.

9         16.     Defendant Duramed Pharmaceuticals Inc. is a corporation organized under the laws
10  of the State of Delaware, with its principal place of business at 400 Chestnut Ridge Road,
11  Woodcliff Lake, New Jersey. Duramed was a subsidiary of Barr until December 2008, when Barr
12  was acquired by Teva and Duramed became a subsidiary of Teva and is now known as Teva
13  Women's Health Inc.

14        17.     Defendant Duramed Pharmaceuticals Sales Corp. is a corporation organized under
15  the laws of the State of Delaware, with its principal place of business at 400 Chestnut Ridge Road,
16  Woodcliff Lake, New Jersey. Duramed was a subsidiary of Barr until December 2008, when it
17  became a subsidiary of Teva.

18        18.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG is a limited partnership
19  organized and existing under the laws of Germany, with its principal place of business at Binger
20  Strasse 173, 55216 Ingelheim, Germany.

21        19.     Defendant Boehringer Ingelheim International GmbH is a limited liability company
22  organized and existing under the laws of Germany, having a principal place of business at Binger
23  Strasse 173, 55216 Ingelheim, Germany.

24        20.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation
25  with its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut.

26  //
27  //
28  //

**CLASS ACTION COMPLAINT**

## FACTUAL ALLEGATIONS

**Market Power Over the Sale of Aggrenox**

21.    Aggrenox is a capsule-form prescription drug containing aspirin and slow-release dipyridamole and is used to reduce the risk of stroke in people who have had transient ischemia of the brain or completed ischemic stroke due to thrombosis. To the extent that it is necessary to define a relevant product market, the relevant market is the market for Aggrenox products in the United States and its territories, including Aggrenox and AB-rated2 bioequivalent products (the "Aggrenox Market").

22.    Prior to and during the Class Period, which continues to the present, Boehringer has had a 100 percent market share of the Aggrenox Market, and will continue to have that market share until a generic equivalent is available to the public. Boehringer's market power over the sale of Aggrenox is perhaps best demonstrated by the fact that it has been able to charge supracompetitive prices for brand-name Aggrenox in the absence of any generic competition

23.    An AB-rating is a designation that the FDA gives to generic drugs that are pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to their brand name counterparts.

24.    As a result of Defendants' agreement not to compete as alleged herein. On average, generic competition results in prices for generic drugs that are 75 percent -80 perfect lower than the brand-name drug.  Given Boehringer's 100 percent monopoly over the sale of Aggrenox, it had and continues to exercise the power to exclude generic competition to branded Aggrenox at the expense of Plaintiff and the Class.

25.    At all relevant times, Boehringer has had the power to maintain the price of Aggrenox at monopolistic and artificially inflated levels without losing substantial sales to other products, as Aggrenox does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic equivalents of Aggrenox. As such, Boehringer has sold branded Aggrenox at prices well in excess of marginal costs and enjoyed high profit margins.

26.    Because of its unique profile as a combined aspirin and extended-release

**CLASS ACTION COMPLAINT**

dipyridamole treatment for subsequent strokes, Aggrenox is differentiated from all products other than AB-rated generic equivalents of Aggrenox. Aggrenox's specific ratio of dipyridamole to aspirin and the release formulations of those components also differentiate it from products aside from AB-rated generic equivalents.

**Regulatory Framework and Industry Background**

27.    A brand name pharmaceutical manufacturer seeking approval from the FDA under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§301-392) ("FDCA") must obtain the FDA's approval to sell the new drug by filing a New Drug Application ("NDA"). The NDA details safety and efficacy studies conducted on the brand-name drug, the components of the drug, the methods used in the "manufacture, process and packaging of the drug," and any patents issued on the composition or methods of using the drug. The FDA publishes the patent information in the "Approved Drug Products with Therapeutic Equivalence Evaluations," also known as the "Orange Book."

28.    In 1984, Congress amended the FDCA with the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984), known as the Hatch-Waxman Act. The Hatch-Waxman Act permits a generic pharmaceutical manufacturer to file an Abbreviated New Drug Application ("ANDA") with the FDA prior to the expiration of a brand-name manufacturer's patent without infringing the brand-name manufacturer's patent. This allows generic manufacturers to avoid the more costly process of filing an NDA and conducting time-consuming studies when seeking to enter into the market a generic version of a pharmaceutical already listed in the Orange Book. It also allows the generic manufacturer to rely on the brand-name manufacturer's previous research and the FDA's determination concerning the brand-name pharmaceutical's safety.

29.    Under the Hatch-Waxman Act, an ANDA requires that a generic manufactured drug has the "same active ingredients as," and is "biologically equivalent" to, the FDA-approved brand- name drug. Additionally, a generic manufacturer must ensure in its ANDA that the generic drug will not infringe the brand-name manufacturer's patent. It can do so by making one of the following four certifications: (1) that the brand-name manufacturer has not filed any relevant

1   patent; (2) that a patent on the brand-name drug has expired; (3) that a brand-name patent exists

2   but that it would not market any generic drug until the still-in-force patent expires; or (4) that the

3   "patent is invalid or will not be infringed by the manufacture, use, or sale if the new drug for

4   which the application is submitted."

5        30.     Generic companies often challenge a patent under the fourth option, known as a

6   "Paragraph IV" certification. Taking this route is deemed an act of patent infringement and can

7   trigger brand-name manufacturers to institute patent litigation against the generic challenger. If the

8   brand-name manufacturer brings an infringement suit within 45 days of receiving notice of the

9   "Paragraph IV" certification, the FDA then must withhold approving the generic, usually for a 30-

10  month period, while the parties litigate patent validity or infringement in court. If the courts decide

11  the matter within that period, the FDA follows that determination; if they do not, the FDA may go

12  forward and give approval to market the generic product. Thus the brand-name manufacturer has

13  the opportunity to delay final approval of the generic manufacturer's ANDA and ultimately the

14  sale of the competing generic drug simply by filing patent litigation within the 45-day period

15  specified in the Hatch-Waxman Act.

16       31.     To incentivize challenges to patents of "pioneer" drugs, the first generic

17  pharmaceutical manufacturer to file an ANDA with a Paragraph IV certification obtains 180 days

18  of exclusivity from the first commercial marketing of its drug during which no other generic

19  manufacturer can compete with the brand-name drug. If the first-to-file generic manufacturer can

20  overcome any patent hurdles and successfully bring the generic drug to the market, this exclusivity

21  period can generate hundreds of millions of dollars in profits for the company as it solicits

22  business away from the brand-name manufacturer with lower prices.

23       32.     As manufacturers of generic drugs typically price their versions of brand-name

24  drugs substantially below the brand-name price, once generics are available pharmacists tend to

25  generously substitute generic versions for their brand-name counterparts whenever substitution is

26  legally permissible. Once the 180-day exclusivity period ends and additional manufacturers start

27  selling competing generic versions of the once-exclusive brand-name drug, prices for generic

28  versions of the drug predictably decrease even further because of competition among the generic

- 8 -
**CLASS ACTION COMPLAINT**

1  manufacturers, and the loss of sales volume by the brand-name drug to the corresponding generic

2  drugs accelerates.

3      33.    Virtually all states encourage, and some require, pharmacists to substitute an AB-

4  rated generic drug for its corresponding brand-name drug unless the doctor has stated that the

5  prescription for the brand-name product must be dispensed as written. In other words, pharmacists

6  generally need not seek or obtain permission from the prescribing doctor before substituting an

7  AB- rated generic for a brand-name drug. Additionally, many third-party payors (such as health

8  insurance plans and Medicaid programs) have adopted policies to encourage the substitution of

9  AB-rated generic drugs for their brand-name counterparts. Moreover, many consumers routinely

10 switch from a brand-name drug to an AB-rated generic drug once the generic becomes available in

11 order to save on out-of-pocket expenses for their prescriptions. Consequently, AB-rated generic

12 drugs typically capture a significant share of their brand-name counterparts' sales, causing a rapid

13 and significant reduction of the brand-name drug's unit and dollar sales.

14     34.    Once a generic equivalent enters the market, it captures 80 percent of sales of the

15 brand-name drug on average within the first six months, and once multiple generic manufacturers

16 enter the picture, the generic equivalents can sell for in price as much as 80 percent -85 percent

17 less than the brand-name drug. Generic competition not only lowers the price to purchasers of

18 generic versions of a brand-name drug, but it also reduces the price to consumers of the brand-

19 name drug. Until a generic manufacturer enters the market, however, there is no bioequivalent

20 generic drug to compete with the brand-name drug, and therefore the brand-name manufacturer

21 can continue to profit from supracompetitive pricing without losing its brand-name sales.

22 Consequently, brand-name drug manufacturers have a strong incentive to use various tactics to

23 delay the introduction of generic competition into the market.

24 **The Rise and Development of Pay-For-Delay Settlements**

25     35.    Given that under the Hatch-Waxman Act brand-name manufacturers can

26 automatically obtain a two-and-a-half year stay of FDA approval of an ANDA with a Paragraph

27 IV certification by initiating a patent infringement suit against the generic manufacturer, brand-

28 name manufacturers often sue generic manufacturers simply to delay generic competition, rather

1    than to enforce valid patents against infringing products. Accused infringers have been successful

2    in patent cases brought against them. Studies have shown that generic manufacturers who file an

3    ANDA with a Paragraph IV certification and are subsequently sued by the brand-name

4    manufacturer enjoy up to a 75 percent success rate fighting the patent infringement suit.

5         36.    With millions, and sometimes even billions, of dollars at stake, instead of doubling

6    down on the validity of their patents, brand-name manufacturers have devised agreements

7    variously called reverse payment, exclusion payment, or pay-for-delay settlements that split

8    monopoly profits with generic manufacturers for the duration of the patent, thereby settling the

9    patent infringement litigation and protecting future brand-name profits from generic competition.

10   The pay-for-delay settlement essentially transfers wealth from consumers to drug makers, in the

11   form of continued high pharmaceutical prices, with brand-name manufacturers sharing a portion

12   of that transfer with the generic manufacturer.

13        37.    These agreements not only delay market entry of the first generic applicant, but

14   also the market entry of all other generic manufacturers. By agreeing not to begin marketing a

15   generic drug, the first generic applicant thereby delays the start of the 180-day period of generic

16   market exclusivity. This tactic creates a "bottleneck" because later generic applicants cannot

17   launch their generic versions of the product until the first generic applicant's 180-day exclusivity

18   has elapsed or is forfeited.

19        38.    In the wake of increased antitrust scrutiny by the FTC, the Department of Justice

20   ("DOJ") and others, brand and generic manufacturers have devised more sophisticated and

21   creative arrangements to disguise the reverse payment agreements. These arrangements, which

22   sometimes arise in side or separate business deals, typically take two complementary forms: (i)

23   overpayment by the brand-name manufacturer for value contributed by the generic

24   manufacturer, and/or; (ii) underpayment by the generic manufacturer for value provided by the

25   brand-name manufacturer.

26        39.    In the first and most common type of arrangement, which typically takes the form

27   of a side deal, the generic manufacturer contributes, in addition to delayed market entry, some

28   further value that can take the form of a wide range of product development, manufacturing and/or

**CLASS ACTION COMPLAINT**

1   promotional services. These side deals provide an opportunity to overstate the value of the

2   contributions from the generic manufacturer and claim that the cash provided by the brand-name

3   manufacturer is consideration for the contributed value, rather than in exchange for delayed entry.

4         40.     In the second type of arrangement, the brand-name manufacturer will refrain from

5   marketing its own generic alternative to the brand-name drug, and instead agrees to allow the

6   generic manufacturer to sell an "authorized generic" version of the brand-name drug during the

7   180-day period. Because brand-name manufacturers have already obtained FDA approval to sell

8   their brand- name drugs, they are free to launch authorized generics during the first-filer's 180-day

9   exclusivity window in an effort to recapture some of the monopoly profits that are inherently lost

10  by generic market entry. But brand-name manufacturers often forego the lucrative practice of

11  marketing an authorized generic by entering into an agreement with the first-filer generic

12  manufacturer whereby compensation to the generic manufacturer is buried in the discounted price

13  offered by the brand- name manufacturer (thus, the underpayment) and the fact that the brand-

14  name manufacturer has agreed not to launch its own competing authorized generic.

15        41.     A recent FTC study found that authorized generics marketed and sold by brand-

16  name manufacturers capture a significant portion of sales, reducing the first-filer generic

17  manufacturer's revenues by approximately 50% on average during the 180-day exclusivity period.

18  Thus the brand- name manufacturer's agreement not to launch an authorized generic has

19  tremendous value to the generic manufacturer given the significant negative effect of an

20  authorized generic on the first-filing generic manufacturer's revenues. Although first-filing

21  generic manufacturers make significantly less money when they must compete with an authorized

22  generic during the first 180 days, consumers and other drug purchasers such as Plaintiff and the

23  Class benefit from the lower prices resulting from competition between the authorized generic and

24  the first-filing generic.

25        42.     Senator Orrin Hatch, for whom the Hatch-Waxman Act was named and who was

26  instrumental in its development, made the following comments in congressional hearings

27  regarding these pay-for-delay agreements: "As a coauthor, I can tell you that I find these type of

28  reverse payment collusive arrangements appalling . . . . We did not wish to encourage situations

**CLASS ACTION COMPLAINT**

1   where payments were made to generic firms not to sell generic drugs and not to allow multisource

2   generic competition."

3   **Boehringer's Aggrenox Launch, Barr's ANDA and the Ensuing Patent Litigation**

4        43.    On November 22, 1999, the FDA granted approval to Boehringer for NDA 20-884

5   to market Aggrenox to help "reduce the risk of stroke in patients who have had transient ischemia

6   of the brain or completed ischemic stroke due to thrombosis." After Boehringer submitted Patent

7   No. 6,015,577 (the "'577 Patent") to the FDA for listing in the Orange Book, the '577 Patent was

8   issued on January 18, 2000 and is scheduled to expire on January 18, 2017.

9        44.    Boehringer began marketing Aggrenox in December 1999. Aggrenox was the only

10  prescription drug for reducing the risk of subsequent stroke through a single aspirin and extended-

11  release dipyridamole capsule. In a clinical trial, Boehringer demonstrated that Aggrenox's

12  dipyridamole-aspirin combination is better than either medication alone at reducing the risk for a

13  subsequent stroke. Aggrenox quickly became a commercial success and a steady source of profits

14  for Boehringer, reaching $366 million in sales in 2008 in the United States alone.

15       45.    On January 31, 2007, Barr submitted ANDA 78-804 to the FDA, seeking approval

16  to market a generic equivalent of Aggrenox, and thereafter submitted ten amendments to its

17  ANDA over the next approximately two-and-a-half years. Barr was the first manufacturer to

18  submit a substantially complete ANDA for generic Aggrenox with a Paragraph IV certification for

19  the '577 Patent. On May 31, 2007, Barr notified Boehringer that it had submitted ANDA 78-804

20  and a Paragraph IV certification regarding the '577 Patent, asserting that its generic would not

21  infringe the patents and/or that the patents were invalid or unenforceable.

22       46.    On July 11, 2007, Boehringer sued Barr in the United States District Court for the

23  District of Delaware, alleging that Barr infringed the '577 Patent when it submitted its ANDA to

24  the FDA seeking approval for a generic version of Aggrenox.  Boehringer's lawsuit triggered the

25  30- month stay, which prohibited the FDA from granting final approval of Barr's ANDA. Barr

26  denied the allegations in Boehringer's complaint that the '577 patent was "duly and legally

27  issued" and counterclaimed for declaratory relief of non-infringement, invalidity, and

28  unenforceability of the '577 Patent. Barr argued that Boehringer's "intentional withholding of

**CLASS ACTION COMPLAINT**

information known to be material to patentability with intent to deceive the PTO [the U.S. Patent and Trademark Office] constitutes inequitable conduct and renders a patent unenforceable." Barr's counterclaim detailed specific information related to a prior patent publication and patent and alleged the Boehringer intentionally misrepresented the materiality and significance of the information.

**Boehringer and Barr's Pay-For-Delay Agreement**

47.    With Barr and Boehringer's patent litigation still in its early stages, Barr announced on August 12, 2008 that it had inked a "Settlement Agreement and a Supply Agreement" to resolve the patent litigation with Boehringer over Aggrenox, and that Barr's subsidiary Duramed "entered into a Co-Promotion Agreement with Boehringer Ingelheim relating to Aggrenox." On August 13, 2008, Boehringer and Barr filed a stipulation seeking dismissal of the patent litigation with prejudice in light of the settlement, and the court entered the stipulation and dismissed the case the next day.

48.    This pay-for-delay arrangement between Boehringer and Barr was comprised of several separate agreements. In the settlement and supply agreements, Boehringer and Barr agreed to dismiss all claims and counterclaims in the patent litigation and Barr agreed to delay launching a generic version of Aggrenox until up to July 1, 2015. Additionally, Boehringer granted Barr a license to market an authorized generic version of Aggrenox under Boehringer's NDA, and Boehringer agreed not to compete against Barr with Boehringer's own authorized generic Aggrenox product. Absent the agreement, Boehringer had every incentive and the ability to launch an authorized generic version of Aggrenox. The intended result of the agreement was that Barr would have 180 days of exclusivity for generic Aggrenox regardless of whether it was statutorily entitled to such exclusivity, and that there would be no competition between Barr's product and Boehringer's authorized generic product during the 180 days of exclusivity and beyond. This aspect of the agreement provides substantial compensation to Barr, which can expect to make approximately double the unit sales, at a much higher price, absent an authorized generic in the market, at the expense of Plaintiff and the Class.

49.    Next, under the "co-promotion agreement," Boehringer agreed to pay Barr (through

- 13 -

**CLASS ACTION COMPLAINT**

1    its subsidiary Duramed, a Teva subsidiary now known as Teva Women's Health) for co-

2    promotion services related to Aggrenox. Boehringer would train the existing 93-person Duramed

3    Specialty Sales Force, who would promote Aggrenox to obstetricians, gynecologists, and

4    women's health care professionals in exchange for a one-time fee plus annual increasing royalties

5    on the total U.S. Aggrenox sales for a period of seven years. The FTC estimated the total value of

6    these payments to be $120 million. The co-promotion agreement was not a stand-alone business

7    transaction, as evidenced by the fact that Boehringer's payments under the agreement vastly

8    exceed the value of the services provided by Barr and its subsidiaries. Moreover, Boehringer's

9    own counsel admitted that the documents related to the co-promotion agreement "'would provide

10   a blueprint for how a company can extract settlement payments'" from Boehringer and other drug

11   makers.

12          50.      Boehringer's payments to Barr under this arrangement were given in exchange for

13   Barr's agreement to delay the entry date of its generic product, and Boehringer and Barr shared the

14   monopoly revenue Boehringer derived as a result of its maintenance of monopoly power over the

15   sale of Aggrenox.

16   **The FTC Investigation**

17          51.      Under the Medicare Prescription Drug, Improvement and Modernization Act of

18   2003, the settlement and co-promotion agreements between Boehringer and Barr were required to

19   be filed with the FTC. Thereafter, on January 15, 2009, just five months after the Barr-Boehringer

20   agreements were announced, the FTC issued a Resolution Authorizing Use of Compulsory

21   Process in the Nonpublic Investigation to determine "'whether Boehringer Ingelheim

22   Pharmaceuticals, Inc. and Barr Pharmaceuticals, Inc., and their affiliates, or any other person, has

23   engaged or is engaging in unfair methods of competition . . . with respect to the sale of Aggrenox

24   or its generic equivalents.'" Petition of FTC for an Order Enforcing Subpoena Duces Tecum

25   Issued in Furtherance of a Law Enforcement Investigation, ¶5, FTC v. Boehringer Ingelheim

26   Pharm., Inc., No. 1:09-mc- 00564 (D.D.C. Oct. 23, 2009). As the FTC explained, "[c]ompensation

27   rarely takes the form of explicit cash payments; instead, the settling firms typically include the

28   payment in a separate business deal executed simultaneously with the settlement." Brief of

1   Appellant Federal Trade Commission at 9, *FTC v. Boehringer Pharm., Inc.*, No. 12-5393 (D.C.

2   Cir. June 28, 2013) ("FTC Brief").

3        52.     Pursuant to §§ 3 and 9 of the FTC Act, 15 U.S.C. §§ 43 and 49, on February 5,

4   2009 the FTC issued a subpoena duces tecum to Boehringer seeking 37 categories of documents,

5   including documents related to, inter alia, the settlement of the patent litigation and documents

6   related to all agreements that Boehringer entered into with Barr at the time of the settlement. The

7   FTC subpoena seeks – and Boehringer has so far refused to provide – its internal financial analysis

8   regarding whether the payments Boehringer made to Barr under the co-promotion agreement were

9   for promotional services alone, or were "side-payments for an anticompetitive agreement to delay

10  generic entry and share the ensuing monopoly profits." FTC Brief at 2.  Boehringer has not

11  produced any documents that would substantiate its assertion that the co-promotion agreement

12  provided Boehringer with substantial value distinct and apart from the benefits it derived from

13  delaying generic competition for Aggrenox.

14       53.     In light of Boehringer's refusal to turn over the relevant documents in response to

15  the FTC's subpoena, on October 23, 2009, the FTC filed a petition with the District Court for the

16  District of Columbia to enforce the subpoena. On December 12, 2012, after the District Court had

17  determined that Boehringer's internal financial analyses regarding the co-promotion agreement

18  were privileged and in large part denied the FTC's petition, the agency filed a Notice of Appeal

19  with the Court of Appeals for the District of Columbia.

20       54.     While Boehringer has not provided the FTC with its internal financial analyses, the

21  FTC is in possession of the terms of the co-promotion agreement. Based on this information, the

22  FTC described the payments under the co-promotion agreement as a "significant financial

23  transaction." FTC Brief at 36 n.12. In its June 28, 2013 brief before the circuit court, the FTC

24  explained that:

25       Under the agreement, Boehringer agreed to pay Barr a one-time

26       fee plus annual, increasing royalties on the total U.S. Aggrenox

27       sales for a period of years. In 2008, Aggrenox had total U.S. sales

28       of about $366 million. At this level of sales, the FTC estimates that

**CLASS ACTION COMPLAINT**

1        the deal would ultimately cost Boehringer over $120 million in

2        royalties.

3 *Id*. (citations omitted). The FTC's investigation is ongoing.

4       55.     During the FTC investigation of Boehringer and Barr's agreements, Boehringer's

5 counsel admitted that the co-promotion agreement was the means by which Boehringer paid Barr

6 to refrain from competing in the Aggrenox Market. He described it as "part and parcel of the

7 settlement. It was part of the flow of compensation. It was part of the considerations of the

8 settlement . . . ."   In fact, the magistrate judge presiding over the matter acknowledged that

9 Boehringer admitted that the "terms of the co-promotion agreement were indeed part of the

10 litigation settlement and the two processes informed one another," and that "the co-promotion

11 agreement arose during the settlement discussions and, in fact, was part of the settlement." Upon

12 reviewing the record, the court concluded: "I agree that the co-promotion agreement was an

13 integral part of the litigation."

14 **Anticompetitive Consequences and Antitrust Injury**

15       56.     Defendants' anticompetitive scheme had the purpose and effect of unreasonably

16 restraining and injuring competition by protecting Aggrenox from generic competition. But for the

17 unlawful agreements between Boehringer and Barr, Barr would have entered the market upon

18 receiving final FDA approval and Boehringer would have launched an authorized generic version

19 of Aggrenox simultaneously with the launch of Barr's generic Aggrenox product.

20       57.     But for the Defendants' illegal conduct, generic competition would have forced a

21 decrease in the price of branded Aggrenox, and price competition among the suppliers of branded

22 and generic Aggrenox would have ensued. Moreover, but for the Defendants' illegal conduct,

23 Plaintiff and Class members would have paid less for Aggrenox or a generic equivalent than they

24 did in the wake of Defendants' scheme. Defendants' conduct directly injured Plaintiff and Class

25 members because if forced them to pay hundreds of millions of dollars in overcharges on their

26 Aggrenox purchases.

27       58.     As a result of the delay in generic competition brought about by Defendants'

28 anticompetitive agreements, Plaintiff and Class members paid more for Aggrenox products than

1    they would have paid absent the Defendants' illegal conduct.

2        59.    Barr had extensive experience in the pharmaceutical industry, including experience

3    obtaining approval of ANDAs, manufacturing commercial launch quantities adequate to meet

4    market demand, and marketing generic pharmaceutical products.

5        60.    If generic competition for Aggrenox had not been unlawfully delayed, consumers

6    would have paid less for Aggrenox by substituting purchases of less-expensive AB-rated generic

7    equivalents of Aggrenox for their purchases of more-expensive brand-name Aggrenox, and by

8    purchasing brand-name Aggrenox at a reduced price. Thus, the Defendants' unlawful conduct

9    deprived Plaintiff and members of the Class of the benefits of competition that the antitrust laws

10   were designed to ensure.

11       61.    During the Class Period (as defined below), Plaintiff and Class members purchasd

12   for substantial amounts of Aggrenox indirectly from Boehringer. As a result of the Defendants'

13   illegal conduct, these purchasers were compelled to pay artificially inflated prices for Aggrenox.

14   Those prices were substantially higher than the prices that Plaintiff and Class members would

15   have paid absent the illegal conduct alleged in this complaint.

16       62.    As a consequence, purchasers of Aggrenox have sustained substantial losses and

17   damage to their business and property in the form of overcharges. The full amount, forms, and

18   components of such damages will be calculated after discovery and upon proof at trial.

19       63.    Defendants' efforts to restrain competition in the market for Aggrenox have

20   substantially affected interstate and foreign commerce. Additionally, at all material time,

21   Defendants transmitted funds and contracts, invoices, and other forms of business communications

22   and transactions in a continuous and uninterrupted flow of commerce across state and national

23   lines in connection with the sale of Aggrenox.

24       64.    At all material times, Boehringer manufactured, promoted, distributed, and sold

25   substantial amounts of Aggrenox in a continuous and uninterrupted flow of commerce across state

26   and national lines and throughout the United States. Defendants' anticompetitive conduct had

27   substantial intrastate effects in every state of purchase in that, among other things, retailers within

28   each state were foreclosed from offering cheaper generic equivalents of Aggrenox to purchasers

**CLASS ACTION COMPLAINT**

1  within each state, which directly impacted and disrupted commerce for consumers within each

2  state.

3       65.    General economic theory recognizes that any overcharge at a higher level of

4  distribution generally results in higher prices at every level below. The institutional structure of

5  pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher

6  level of distribution are passed on to consumers. Wholesalers and retailers passed on the inflated

7  prices of Aggrenox to Plaintiff and Class members.

8       66.    Defendants' anticompetitive conduct enabled Boehringer to indirectly charge

9  consumers prices in excess of what they otherwise would have been able to charge absent the

10  Defendants' unlawful actions. The prices were inflated as a direct and foreseeable result of

11  Defendants' anticompetitive conduct. The inflated prices that Plaintiff and Class members have

12  paid are traceable to, and the foreseeable result of, the overcharges by Boehringer.

13  **Defendants' Illegal Agreement to Suppress Generic Competition for Aggrenox Is Ongoing**

14  **and Continues to Harm Plaintiff and the Class**

15       67.    The lack of generic competition for Aggrenox is the direct result of Defendants'

16  ongoing unlawful conduct and unlawful agreements between Boehringer and Barr that began in

17  2008, have continued since then, and could continue until July 1, 2015. On December 23, 2008,

18  Teva acquired Barr and stepped into Barr's shoes with respect to the reverse payment agreement

19  with Boehringer. Teva has continued to refrain from entering the market with a generic equivalent

20  of Aggrenox. Teva thus joined the unlawful agreements and conspiracy to suppress generic

21  competition of Aggrenox.

22       68.    As a result of its acquisition of Barr, Teva would own (either directly or indirectly)

23  ANDA 78-804 and the 180-day exclusivity period that Barr may be entitled to as the first filer.

24  After the acquisition, Teva continued to pursue approval of ANDA 78-804, and on August 14,

25  2009 the FDA granted final approval of ANDA 78-804 for a generic equivalent of Aggrenox, and

26  noted that Teva may have forfeited its 180-day exclusivity for failing to receive tentative approval

27  within the requisite 30 months.

28       69.    As of the filing of this complaint, no generic equivalent of Aggrenox has been

**CLASS ACTION COMPLAINT**

1  available in the United States, although another generic manufacturer, Kremers Urban

2  Pharmaceuticals, Inc., has filed an ANDA for generic Aggrenox that includes a Paragraph IV

3  certification for the '577 Patent. If Teva is found eligible for 180 days of marketing exclusivity

4  and launches a generic equivalent of Aggrenox on July 1, 2015, the earliest another company can

5  introduce a generic equivalent of Aggrenox is December 2015. Therefore, because of Defendants'

6  unlawful agreement, no generic equivalent of Aggrenox has been on the market and it is unlikely

7  that any generic Aggrenox product will enter the market prior to July 2015.

8      70.    Boehringer continues to sell brand name Aggrenox at artificially inflated and

9  supracompetitive prices, and Plaintiff and Class members have been denied the lower prices that

10  generic competition would have brought to the market, and have been injured every day that the

11  Defendants' unlawful agreement has been in place.

12      71.    But for the anticompetitive, illegal, and ongoing conduct alleged in this complaint,

13  Plaintiff and members of the Class would have had access to less expensive versions of Aggrenox

14  much sooner than they currently will. Defendants have injured Plaintiff and Class members by

15  causing them to pay substantial overcharges – potentially hundreds of millions of dollars – on their

16  purchases of Aggrenox.

17  **FRAUDULENT CONCEALMENT**

18      72.    Plaintiff and Class members had no knowledge of Defendants' unlawful scheme

19  and could not have discovered the scheme and conspiracy through the exercise of reasonable

20  diligence more than four years prior to the filing of this complaint.

21      73.    The nature of Defendants' conspiracy was self-concealing, and Defendants

22  employed deceptive practices and techniques of secrecy to avoid detection of, and to fraudulently

23  conceal, their contract, combination, conspiracy, and scheme. Notwithstanding the self-concealing

24  nature of their conspiracy, Defendants wrongfully and affirmatively concealed the existence of

25  their continuing combination and conspiracy from Plaintiff and Class members by, among other

26  things:

27      (a)    Concealing the amounts that Boehringer was to pay and paid Barr/Teva under their

28  pay-for-delay arrangement;

**CLASS ACTION COMPLAINT**

(b)     Concealing the fact that the purpose of the payments under the co-promotion agreement was to provide compensation to Barr/Teva in connection with the settlement of the '577 Patent litigation and the entry date for Barr/Teva's generic product;

(c)     Concealing the fact that those amounts far exceeded any lawful economic benefit that Boehringer received from Barr/Teva under the agreement; and

(d)     Filing documents with the SEC that failed to disclose the existence or nature of the pay-for-delay arrangement. Teva's fiscal year 2008 20-F did not mention the settlement of the Aggrenox litigation. The 20-F also mentioned a co-promotion agreement for a different pharmaceutical product, but did not mention the Aggrenox co-promotion agreement. Teva's 20-F filings for the fiscal years 2009, 2010, 2011, and 2012 similarly failed to disclose the Aggrenox settlement or the co-promotion agreement.

74.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants, Plaintiff and Class members had no knowledge of the conspiracy more than four years prior to the filing of this complaint, or of the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

75.     Plaintiff and Class members also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred, including the amounts of payments made from Boehringer to Barr/Teva under the co-promotion agreement. Reasonable diligence on the part of Plaintiff and Class members would not have uncovered those facts more than four years prior to the filing of this complaint.

76.     As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and Class members' claims have been tolled.

77.     Alternatively, if the statute of limitations is not tolled, this complaint alleges a continuing course of conduct (including conduct within the limitations period), and Plaintiff and Class members can recover damages they suffered during the limitations period.

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action individually and, under Fed. R. Civ. P. 23(a) and (b)(3), as representative of a Class of consumers defined as follows:

**CLASS ACTION COMPLAINT**

1       All natural persons who indirectly purchased and/or paid for some or all of the purchase

2 price for Aggrenox, in any form, in the United States and the District of Columbia and Puerto

3 Rico, for consumption by themselves, their families, or their members (the "Class"), other than for

4 resale, during the period November 2009 through and until the anticompetitive effects of

5 Defendants' unlawful conduct cease (the "Class Period").  The Class shall be divided into twenty-

6 six  (26) subclasses, one for each of the States and Puerto Rico mentioned below.  Excluded from

7 the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or

8 affiliates, and all federal governmental entities.

9       79.    Members of the Class are so numerous and geographically dispersed that joinder is

10 impracticable. Further, the Class is readily identifiable from information and records in the

11 possession of the Defendants.

12       80.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff

13 and all members of the Class were damaged by the same wrongful conduct of Defendants, i.e.,

14 they paid artificially inflated prices for Aggrenox and were deprived of the benefits of earlier and

15 more robust competition from cheaper generic versions of Aggrenox as a result of Defendants'

16 wrongful conduct.

17       81.    Plaintiff will fairly and adequately protect and represent the interests of the Class.

18 The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

19       82.    Plaintiff is represented by counsel with experience in the prosecution of class

20 action antitrust litigation.

21       83.    Questions of law and fact common to the members of the Class predominate over

22 questions that may affect only individual Class Members because Defendants have acted on

23 grounds generally applicable to the entire Class, thereby making overcharge damages with respect

24 to the Class as a whole appropriate.

25       84.    Questions of law and fact common to the Class include, but are not limited to:

26       (a)    whether  Defendants  conspired  to  willfully  maintain  and/or  enhance

27 Boehringer's monopoly power over Aggrenox;

28       (b)    whether Defendants conspired to suppress generic competition to Aggrenox;

**CLASS ACTION COMPLAINT**

1

2    (c)    whether Defendants entered into an unlawful agreement or agreements in restraint

3    of trade;

4    (d)    whether, pursuant to the agreements, the generic defendants agreed to delay their

5    entry into the market with generic Aggrenox;

6    (e)    whether, pursuant to the agreements, Boehringer compensated the generic

7    defendants;

8    (f)    whether Boehringer's compensation to the generic defendants was for any purpose

9    other than delayed entry of generic Aggrenox;

10    (g)    whether Boehringer's compensation to the generic defendants was necessary to

11   yield some procompetitive benefit that is cognizable and non-pretextual;

12    (h)    whether the agreements created or stymied more robust generic competition;

13    (i)    whether one or more of the agreements is illegal;

14    (j)    whether Boehringer possessed substantial market power over Aggrenox;

15    (k)    whether the law requires definition of a relevant market when direct proof of

16   monopoly power is available and, if so, the definition of the relevant market;

17    (l)    whether Boehringer maintained monopoly power over Aggrenox by unlawfully

18   suppressing generic competition to Aggrenox;

19    (m)    whether the activities of Defendants as alleged herein have substantially affected

20   interstate commerce;

21    (n)    whether, and to what extent, Defendants' conduct caused antitrust injury (i.e.,

22   overcharges) to Plaintiff and the members of the Class; and

23    (o)    the amount of aggregate overcharge damages to the Class.

24    85.    Class action treatment is a superior method for the fair and efficient adjudication of

25   this controversy. Such treatment will permit a large number of similarly situated persons to

26   prosecute their common claims in a single forum simultaneously, efficiently, and without

27   necessary duplication of evidence, effort, or expense that numerous individual actions would

28   engender. The benefits of proceeding through the class mechanism, including providing injured

**CLASS ACTION COMPLAINT**

persons or entities a method of obtaining redress on claims that could not practically be pursued individually, substantially outweighs potential difficulties in management of this class action.

86.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## COUNT I

Claim for Injunctive Relief Under §16 of the Clayton Act For Violations of §§ 1 and 2 of the Sherman Act Against All Defendants

87.     Plaintiff realleges and incorporates the preceding allegations of this complaint with the same force and effect as if fully restated herein.

88.     Plaintiff brings this case under § 16 of the Clayton Act (15 U.S.C. § 26) individually and on behalf of the Class.

89.     Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to block and delay entry of competing AB-rated generic versions of Aggrenox. The intended and accomplished goal of the scheme was to maintain Boehringer's monopoly power using restrictive and exclusionary conduct to delay FDA approval of ANDAs for generic Aggrenox products. Defendants injured Plaintiff and the Class through, inter alia, agreements to exclude generic Aggrenox products from the market in exchange for cash payments and royalties on the brand-name Aggrenox product.

90.     Boehringer repeatedly asserted that the generic Aggrenox formulations of its competitors infringed its patents, despite knowing that the Aggrenox patents were invalid and/or unenforceable.

91.     It was the Defendants' conscious objective to further Boehringer's monopoly in the relevant market through the overarching anticompetitive scheme. Defendants conspired to monopolize, and did wrongfully and intentionally maintain monopoly power, with respect to Aggrenox in violation of § 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiff and members of the Class paid artificially inflated prices.

92.     Had manufacturers of generic Aggrenox products entered the market and lawfully competed with Boehringer in a timely fashion, Plaintiff and other members of the Class would

**CLASS ACTION COMPLAINT**

1    have substituted lower-priced generic Aggrenox products for the higher-priced brand-name

2    Aggrenox for some or all of their Aggrenox product requirements, and/or would have paid lower

3    net prices on their remaining Aggrenox and/or AB-rated bioequivalent purchases.

4         93.     Defendants intended, and accomplished, a horizontal market allocation of the

5    Aggrenox Market, a per se violation of § 1 of the Sherman Act.  By their agreement, Defendants

6    intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in

7    violation of § 1 of the Sherman Act. As a result of this unreasonable restraint on competition,

8    Plaintiff and members of the Class paid artificially inflated prices for their Aggrenox

9    requirements.

10        94.     Plaintiff and members of the Class purchased substantial amounts of Aggrenox

11   indirectly from Boehringer and/or other manufacturers.

12        95.     Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 18 U.S.C. § 2201(a)

13   hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as

14   described herein violates §§1 and 2 of the Sherman Act.

15        96.     Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16

16   of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive

17   market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that

18   similar anticompetitive conduct does not reoccur in the future.

19                              **COUNT II**

20            Claim For Monopolization Under State Law Against Defendant Boehringer

21        97.     Plaintiff realleges and incorporates the preceding allegations of this complaint with

22   the same force and effect as if fully restated herein.

23        98.     At all relevant times, Boehringer possessed substantial market power (i.e.,

24   monopoly power) in the Aggrenox Market. Boehringer possessed the power to control prices in,

25   prevent prices from falling in, and exclude competitors from the Aggrenox Market.

26        99.     Through the overarching anticompetitive scheme, as alleged above, Boehringer

27   willfully maintained its monopoly power in the Aggrenox Market using restrictive or exclusionary

28   conduct, rather than by means of greater business acumen, in order to exclude competition for its

1    monopolized Aggrenox product.

2        100.    The goal, purpose and effect of Boehringer's scheme was to prevent and delay the

3    sale of Aggrenox products in the United States at prices substantially below Boehringer's prices

4    for Aggrenox, thereby effectively preventing the average market price of Aggrenox products from

5    declining dramatically.

6        101.    By engaging in the foregoing conduct, Boehringer has violated the following

7    states' antitrust and/or unfair and deceptive trade practices acts:

8        a.    Arizona: The aforementioned practices by Boehringer were and are in violation of

9    the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §44-1401, et seq., the Arizona Consumer

10   Fraud Act, Ariz. Rev. Stat. §44-1521, et seq., and the constitution of the State of Arizona, Article

11   14, §15;

12       b.    California: The aforementioned practices by Boehringer were and are in violation

13   of the Cartwright Act, Cal. Bus. & Prof. Code §16700, et seq., and the California Unfair

14   Competition Act, Cal. Bus. & Prof. Code §17200, et seq.;

15       c.    District of Columbia: The aforementioned practices by Boehringer were and are in

16   violation of the District of Columbia Antitrust Act, D.C. Code §28-4501, et seq.;

17       d.    Florida: The aforementioned practices by Boehringer were and are in violation of

18   the Florida Antitrust Act, Fla. Stat. §542.15, et seq., and the Florida Deceptive and Unfair Trade

19   Practices Act, Fla. Stat. Ann. §501.201, et seq.;

20       e.    Illinois: The aforementioned practices by Boehringer were and are in violation of

21   the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/7(2);

22       f.    Iowa: The aforementioned practices by Boehringer were and are in violation of the

23   Iowa Competition Law, Iowa Code §§553.4, 553.5 (1997);

24       g.    Kansas: The aforementioned practices by Boehringer were and are in violation of

25   the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §50-101, et seq.;

26       h.    Massachusetts: The aforementioned practices by Boehringer were and are in

27   violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch 93A, §11;

28       i.    Maine: The aforementioned practices by Boehringer were and are in violation of

**CLASS ACTION COMPLAINT**

the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §1101, et seq.;

j.      Michigan: The aforementioned practices by Boehringer were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §445.771, et seq., and the Michigan Consumer Protection Act, §445.901, et seq.;

k.      Minnesota: The aforementioned practices by Boehringer were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §325D.49, et seq., and the Minnesota Consumer Fraud Act, Minn. Stat §325F.68, et seq.;

l.      Mississippi: The aforementioned practices by Boehringer were and are in violation of Miss. Code Ann. §75-21-1, et seq.;

m.      Missouri: The aforementioned practices by Boehringer were and are in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.025;

n.      Nebraska: The aforementioned practices by Boehringer were and are in violation of Ne. Rev. Stat. §59-801, et seq.;

o.      Nevada: The aforementioned practices by Boehringer were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §598A.010, et seq., and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §598.0903, et seq.;

p.      New Mexico: The aforementioned practices by Boehringer were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §57-1-1, et seq., and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §57-12-1, et seq.;

q.      New York: The aforementioned practices by Boehringer were and are in violation of N.Y. Gen. Bus. Law §340, et seq., and N.Y. Gen. Bus. Law §349, et seq.;

r.      North Carolina: The aforementioned practices by Boehringer were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §75-1, et seq.;

s.      North Dakota: The aforementioned practices by Boehringer were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §51-08.1-01, et seq.;

t.      Pennsylvania: The aforementioned practices by Boehringer were and are in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §201-1, et seq.;

**CLASS ACTION COMPLAINT**

1    u.    Puerto Rico: The aforementioned practices Boehringer were and are in violation of

2  the Puerto Rico Antitrust Act, Puerto Rico Code 10 LPRA §257, et seq.;

3    v.    South Dakota: The aforementioned practices by Boehringer were and are in

4  violation of South Dakota's antitrust law, S.D. Codified Laws §37-1-3.1, et seq.;

5    w.    Tennessee: The aforementioned practices by Boehringer were and are in violation

6  of the Tennessee Trade Practices Act, Tenn. Code Ann. §47-25-101, et seq., and the Consumer

7  Protection Act, Tenn. Code Ann. §47-18-101, et seq.;

8    x.    Vermont: The aforementioned practices by Boehringer were and are in violation of

9  the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §2451, et seq.;

10    y.    West Virginia: The aforementioned practices by Boehringer were and are in

11  violation of the West Virginia Antitrust Act, W. Va. Code §47-18-1; and

12    z.    Wisconsin: The aforementioned practices by Boehringer were and are in violation

13  of the Wisconsin Antitrust Act, Wis. Stat. §133.01, et seq., and Wisconsin's unfair competition

14  statute, Wis. Stat. §100.20, et seq.

15    102.    Plaintiff and members of the Class have been injured in their business or property

16  by reason of Boehringer's antitrust violations alleged in this Claim. Their injuries consist of: (1)

17  being denied the opportunity to purchase lower-priced generic Aggrenox sooner, and (2) paying

18  higher prices for Aggrenox than they would have paid in the absence of Boehringer's conduct.

19  These injuries are the type the antitrust laws were designed to prevent, and flow from that which

20  makes Boehringer's conduct unlawful.

21    103.    Plaintiff and the Class seek damages and multiple damages as permitted by law for

22  their injuries by Boehringer's violations of the aforementioned statutes.

23                                   **COUNT III**

24      Agreement in Restraint of Trade in Violation of State Law Against All Defendants

25    104.    Plaintiff realleges and incorporates the preceding allegations of this complaint with

26  the same force and effect as if fully restated herein.

27    105.    Beginning in and/or around August 2008 and continuing through the present,

28  Defendants willfully and unlawfully engaged in a continuing illegal conspiracy to monopolize the

**CLASS ACTION COMPLAINT**

1    Aggrenox Market by engaging in an anticompetitive scheme to keep generic equivalents from the

2    market – not as a result of providing a superior product, business acumen, or historical accident.

3         106.    The agreement between Boehringer and the generic defendants to monopolize the

4    Aggrenox Market includes overt acts between separate economic entities – actual and potential

5    competitors – and is illegal per se under state antitrust laws. Alternatively, this complaint alleges

6    that the agreement and conspiracy to monopolize is a violation of state antitrust law under a "quick

7    look" or "rule of reason" analysis.

8         107.    Boehringer and the generic defendants knowingly and intentionally conspired to

9    maintain and enhance Boehringer's monopoly power in the Aggrenox Market. Boehringer and the

10   generic defendants specifically intended that the overarching anticompetitive scheme would

11   maintain Boehringer's monopoly power in the relevant market thereby injuring Plaintiff and the

12   Class.

13        108.    Boehringer and the generic defendants each committed at least one overt act in

14   furtherance of the conspiracy.

15        109.    Defendants' conduct described herein constitutes unlawful acts of monopolization

16   and attempts to monopolize, as well as prohibited practices and unconscionable conduct, under the

17   following state statutes:

18        (a)     Arizona: The aforementioned practices by the Defendants were and are in violation

19   of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §44-1401, et seq., the Arizona

20   Consumer Fraud Act, Ariz. Rev. Stat. §44-1521, et seq., and the Constitution of the State of

21   Arizona, Article 14, §15;

22        (b)     California: The aforementioned practices by the Defendants were and are in

23   violation of the Cartwright Act, Cal. Bus. & Prof. Code §16700, et seq., and the California Unfair

24   Competition Act, Cal. Bus. & Prof. Code §17200, et seq.;

25        (c)     District of Columbia: The aforementioned practices by the Defendants were and are

26   in violation of the District of Columbia Antitrust Act, D.C. Code §28-4501, et seq.;

27        (d)     Florida: The aforementioned practices by the Defendants were and are in violation

28   of the Florida Antitrust Act, Fla. Stat. §542.15, et seq., and the Florida Deceptive and Unfair Trade

**CLASS ACTION COMPLAINT**

1   Practices Act, Fla. Stat. Ann. §501.201, et seq.;

2   (e)   Illinois: The aforementioned practices by the Defendants were and are in violation

3   of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/7(2);

4   (f)   Iowa: The aforementioned practices by the Defendants were and are in violation of

5   the Iowa Competition Law, Iowa Code §§553.4, 553.5 (1997);

6   (g)   Kansas: The aforementioned practices by the Defendants were and are in violation

7   of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §50- 101, et seq.;

8   (h)   Massachusetts: The aforementioned practices by the Defendants were and are in

9   violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch 93A, §11;

10   (i)   Maine: The aforementioned practices by the Defendants were and are in violation

11   of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §1101, et seq.;

12   (j)   Michigan: The aforementioned practices by the Defendants were and are in

13   violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §445.771, et seq., and the

14   Michigan Consumer Protection Act, §445.901, et seq.;

15   (k)   Minnesota: The aforementioned practices by the Defendants were and are in

16   violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §325D.49, et seq., and the

17   Minnesota Consumer Fraud Act, Minn. Stat §325F.68, et seq.;

18   (l)   Mississippi: The aforementioned practices by the Defendants were and are in

19   violation of Miss. Code Ann. §75-21-1, et seq.;

20   (m)   Missouri: The aforementioned practices by the Defendants were and are in

21   violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.025;

22   (n)   Nebraska: The aforementioned practices by the Defendants were and are in

23   violation of Ne. Rev. Stat. §59-801, et seq.;

24   (o)   Nevada: The aforementioned practices by the Defendants were and are in violation

25   of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §598A.010, et seq., and the Nevada

26   Deceptive Trade Practices Act, Nev. Rev. Stat. §598.0903, et seq.;

27   (p)   New Mexico: The aforementioned practices by the Defendants were and are in

28   violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §57-1-1, et seq., and the New Mexico

1   Unfair Practices Act, N.M. Stat. Ann. §57-12-1, et seq.;

2       (q)    New York: The aforementioned practices by the Defendants were and are in

3   violation of the Donnelly Act, N.Y. Gen. Bus. Law §340, et seq., and the New York Deceptive

4   Act and Practices Act, N.Y. Gen. Bus. Law §349, et seq.;

5       (r)    North Carolina: The aforementioned practices by the Defendants were and are in

6   violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §75-1, et seq.;

7       (s)    North Dakota: The aforementioned practices by the Defendants were and are in

8   violation of the North Dakota Antitrust Act, N.D. Cent. Code §51-08.1-01, et seq.;

9       (t)    Pennsylvania: The aforementioned practices by the Defendants were and are in

10  violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat.

11  Ann. §201-1, et seq.;

12      (u)    Puerto Rico: The aforementioned practices by the Defendants were and are in

13  violation of Puerto Rico Antitrust Act, Puerto Rico Code 10 LPRA §257, et seq.;

14      (v)    South Dakota: The aforementioned practices by the Defendant were and are in

15  violation of South Dakota's antitrust law, S.D. Codified Laws §37-1-3.1, et seq.;

16      (w)    Tennessee: The aforementioned practices by the Defendants were and are in

17  violation of the Tennessee Trade Practices Act, Tenn. Code Ann. §47-25-101, et seq., and the

18  Consumer Protection Act, Tenn. Code Ann. §47-18-101, et seq.;

19      (x)    Vermont: The aforementioned practices by the Defendants were and are in

20  violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §2451, et seq.;

21      (y)    West Virginia: The aforementioned practices by the Defendants were and are in

22  violation of the West Virginia Antitrust Act, W. Va. Code §47-18-1; and

23      (z)    Wisconsin: The aforementioned practices by the Defendants were and are in

24  violation of the Wisconsin Antitrust Act, Wis. Stat. §133.01, et seq., and Wisconsin's unfair

25  competition statute, Wis. Stat. §100.20, et seq.

26      110.    Plaintiff and members of the Class have been injured in their business or property

27  by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of: (a)

28  being denied the opportunity to purchase lower-priced generic Aggrenox sooner, and (b) paying

**CLASS ACTION COMPLAINT**

1    higher prices for Aggrenox than they would have paid in the absence of Defendants' conduct.

2    These are the type of injuries the antitrust laws were designed to prevent, and flow from that

3    which makes Defendants' conduct unlawful.

4        111.    Plaintiff and the Class seek damages, multiple damages, treble damages, and other

5    damages as permitted by state law, for their injuries caused by these violations pursuant to these

6    statutes.

7                                       **COUNT IV**

8              Unjust Enrichment and Disgorgement of Profits Against All Defendants

9        112.    Plaintiff realleges and incorporates the preceding allegations of this complaint with

10   the same force and effect as if fully restated herein.

11       113.    Defendants have benefited from the monopoly profits on their sales of Aggrenox

12   and/or AB-rated bioequivalents resulting from the unlawful and inequitable acts alleged in this

13   complaint.

14       114.    Defendants' financial benefits resulting from their unlawful and inequitable

15   conduct are traceable to overpayments for Aggrenox and AB-rated bioequivalents by Plaintiff and

16   members of the Class.

17       115.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the

18   nature of profits resulting from unlawful overcharges and monopoly profits, to the economic

19   detriment of Plaintiff and the Class.

20       116.    It would be futile for Plaintiff and the Class to seek a remedy from any party with

21   whom they had a privity of contract.  Defendants have paid no consideration to anyone for any

22   benefits received indirectly from Plaintiff and the Class. Similarly, it would be futile for Plaintiff

23   and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of

24   distribution from which it indirectly purchased Aggrenox, as they are not liable and would not

25   compensate Plaintiff for unlawful conduct caused by Defendants. The economic benefit of

26   overcharges and unlawful monopoly profits derived by the Defendants through charging

27   supracompetitive and artificially inflated prices for Aggrenox are a direct and proximate result of

28   Defendants' unlawful practices.

**CLASS ACTION COMPLAINT**

1    117.   The financial benefits derived by Defendants rightfully belong to Plaintiff and the

2  Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class

3  Period, inuring to the benefit of Defendants.

4    118.   It would be inequitable under the laws of all states and jurisdictions within the

5  United States for the Defendants to be permitted to retain any of the overcharges for Aggrenox

6  and/or AB- rated bioequivalents derived from Defendants' unfair and unconscionable methods,

7  acts and trade practices alleged in this complaint.

8    119.   Defendants should be compelled to disgorge in a common fund for the benefit of

9  Plaintiff and the Class all unlawful or inequitable proceeds received by them. A constructive trust

10  should be imposed upon all such unlawful or inequitable sums received by Defendants traceable to

11  Plaintiff and the Class.

12    120.   Plaintiff and the Class have no adequate remedy at law.

13                              **PRAYER FOR RELIEF**

14    WHEREFORE, Plaintiff, individually and on behalf of the Class, demands judgment for

15  the following relief:

16    A.   Determine that this action may be maintained as a class action pursuant to Fed. R. Civ.

17  P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P.

18  23(c)(2), be given to the Class and declare the Plaintiff representative of the Class;

19    B.   Declare that the conduct alleged herein is in violation of §§ 1 and 2 of the Sherman

20  Act, of the other statutes set forth above, and of the common law of unjust enrichment under the

21  laws of all states and jurisdictions within the United States;

22    C.   Enjoin Defendants from continuing the illegal activities alleged herein;

23    D.   Enter joint and several judgments against Defendants in favor of Plaintiff and the

24  Class;

25    E.   Grant Plaintiff and the Class equitable relief in the nature of disgorgement,

26  restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

27    F.   Award the Class damages and, where applicable, treble, multiple, punitive, and/or

28  other damages, in an amount to be determined at trial, including interest;

**CLASS ACTION COMPLAINT**

1        G.      Award Plaintiff and the Class their costs of suit, including reasonable attorneys'

2  fees as provided for by law; and

3        H.      Grant such other and further relief as is necessary to correct for the anticompetitive

4  market effort caused by the unlawful conduct of Defendants, and as the Court deems just,

5  equitable and proper.

6                         **JURY DEMAND**

7      121.     Pursuant to Fed. R. Civ. P. 38, Plaintiff, individually and on behalf of the proposed

8  Class, demand a trial by jury on all issues so triable.

9

10  DATED: March 26, 2014         WARD & WILSON, LLC

11

12                      By Patrick Cooper /mrc

13                        Patrick C. Cooper
                              James S. Ward

14                        Ward & Wilson, LLC
                              2100 Southbridge Parkway, Suite 580

15                        Birmingham, AL 35209
                              Tel: 205-871-5404

16

17                        Michael Ghozland
                        Ghozland Law Firm

18                        555 West Fifth Street
                        Suite 3100

19                        Los Angeles, CA 90013
                        Tel: 213-996-8327

20

21                        Peter Burke
                        Burke Harvey, LLC

22                        One Highland Place
                        2151 Highland Avenue, Suite 120

23                        Birmingham, AL 35205-4008
                        Tel: 205-588-8671

24

25                        Attorneys for Plaintiff

26

27

28

**CLASS ACTION COMPLAINT**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| Javid Siminou | Teva Pharmaceuticals USA, INC., et al. |

| **(b) County of Residence of First Listed Plaintiff**   San Bernardino | **County of Residence of First Listed Defendant**   Delaware |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| **(c) Attorneys** (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.<br>Michael Ghozland,<br>Ghozland Law Firm, P.C.,<br>555 West Fifth Street, Suite 3100<br>Los Angeles, CA 90013 – (213) 996-8327 | **Attorneys** (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding   ☐ 2. Removed from State Court   ☐ 3. Remanded from Appellate Court   ☐ 4. Reinstated or Reopened   ☐ 5. Transferred from Another District (Specify)   ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Injunctive Relief under Section 16 of the Clayton Act for violation of the Sherman Act; Claim for Monopolization; Restraint of Trade; Unjust Enrichment

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:   ED CV14-594-

CIVIL COVER SHEET

CV-71 (11/13)   Page 1 of 3

UNITEL    .TES DISTRICT COURT, CENTRAL DISTRICT OF    .FORNIA
CIVIL COVER SHEET

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles | | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | | Western |
| | ☐ Orange | | Southern |
| | ☐ Riverside or San Bernardino | | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes  ☒ No | **A PLAINTIFF?** Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?** Then check the box below for the county  in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right.  ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below.  ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above:  ➡ | Western |

UNITEL    .TES DISTRICT COURT, CENTRAL DISTRICT OF   .FORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**   DATE: 3/26/14

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Central District of California

| | |
|---|---|
| Javid Siminou *individually and* On behalf of all others similarly situated, <br> _____ <br> *Plaintiff(s)* <br><br> v. <br><br> Teva Pharmaceuticals USA, Inc., <br> Additional Parties Attachment Form is attached <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) | **ED CV14-594-RGK AJWx** <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Patrick C. Cooper (SBN 142349)
James S. Ward (Pro hac vice)
Ward & Wilson, LLC
2100 Southbridge Parkway, Suite 580
Birmingham, AL 35209
Tel: 205-871-5404

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

CHRIS SAWYER

Date: 3 - 26 - 14                                   _____
                                                  *Signature of Clerk or Deputy Clerk*

1143

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| Javid Siminou, *individually and* *on behalf of all others similarly* *situated,* | ) ) ) ) ) ) ) ) ) ) ) ) |
| *Plaintiff(s)* | |
| v. | |
| Teva Pharmaceuticals USA, Inc., Additional Parties Attachment Form is attached | |
| *Defendant(s)* | |

ED **CV14-594-RGK** AJWx

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Patrick C. Cooper (SBN 142349)
James S. Ward (Pro hac vice)
Ward & Wilson, LLC
2100 Southbridge Parkway, Suite 580
Birmingham, AL  35209
Tel: 205-871-5404

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: 3-26-14

_____
*Signature of Clerk or Deputy Clerk*

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Siminou v. Teva Pharmaceuticals USA, Inc., et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

Teva Pharmaceutical Industries Limited
5 Basel St. Petach Tickva
49131, Israel

Barr Pharmaceuticals Inc.
225 Summit Ave.
Montvale, NJ 07645

Barr Laboratories Inc.
131-A Stoney Circle, Suite 500
Santa Rosa, CA 65401

Duramed Pharmaceuticals, Inc.
5040 Duramed Drive
Cincinnati, OH, 45213

Duramed Pharmaceuticals Sales Corp.
5040 Duramed Drive
Cincinnati, OH, 45213

Boehringer Ingelheimpharma GMBH & CO. KG
Corporate Division Communications
Binger Strasse 173
55216 Ingelheim am Rhein

Boehringer Ingelheim International GMBH
Corporate Division Communications
Binger Strasse 173
55216 Ingelheim am Rhein

Boehringer Ingelheim Pharmaceuticals, Inc.
Corporate Division Communications
Binger Strasse 173
55216 Ingelheim am Rhein

Page __1__ of __1__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ R. Gary Klausner _____ and the assigned
Magistrate Judge is _____ Andrew J. Wistrich _____ .

The case number on all documents filed with the Court should read as follows:

## EDCV14-594-RGK(AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of
California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ March 26, 2014 _____
Date

By _C. Sawyer_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| [x] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

CV-18 (08/13)            NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES